NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12973


JOHAN ROSENBERG[1]  vs.  JPMORGAN CHASE & CO. & others.[2]



Suffolk.      January 6, 2021. - May 11, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Wendlandt,
& Georges, JJ.



Massachusetts False Claims Act.  Fraud.  Bonds.  Practice,
Civil, Motion to dismiss.  Statute, Construction.




Civil action commenced in the Superior Court Department on
October 23, 2014.

A motion to dismiss, filed on June 5, 2019, was heard by
Mitchell H. Kaplan, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.

_____

[1] On behalf of the Commonwealth.

[2] JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC;
JPMorgan Securities, Inc.; Citigroup, Inc.; Citigroup Global
Markets Inc.; Citibank N.A.; Citigroup Financial Products Inc.;
Citigroup Global Markets Holdings Inc.; Bank of America
Corporation; Bank of America N.A.; Merrill Lynch, Pierce, Fenner
& Smith Incorporated; Morgan Stanley; Morgan Stanley Smith
Barney LLC; Morgan Stanley & Co. LLC; Morgan Stanley Capital
Group Inc.; Morgan Stanley Bank, N.A.; and Morgan Stanley
Capital Services Inc.

Tejinder Singh, of Maryland, for the plaintiff.

Robert N. Hochman, of Illinois (David G. Jorgensen & Holly A. Harrison, of Illinois, Susanna Buergel, of New York, Matthew D. Benedetto, of California, Paul J. Murphy, Carol A. Starkey, Megan E. Barriger, & Kathryn L. Alessi also present) for the defendants.

The following submitted briefs for amici curiae:

Ben Robbins & Martin J. Newhouse for New England Legal Foundation.

Ian D. Roffman, Thomas J. Carey, Jr., & David K. Bastian for Greater Boston Chamber of Commerce.

Sheri Littlefield, of New York, Patrick T. Egan, Justin N. Saif, & Corey W. Silva for CFA Institute.

Jacklyn DeMar, of the District of Columbia, & Sonya A. Rao for Taxpayers Against Fraud Education.

WENDLANDT, J.  The Massachusetts False Claims Act, G. L. c. 12, §§ 5A-5O (MFCA), authorizes a private party to bring an action alleging that a person has committed a fraud on the Commonwealth in connection with a claim for payment under a government program.  Such an action may be a valuable tool to shine a light on fraudulent behavior that otherwise might remain undiscovered.  In return, the private party (known as a "relator") is rewarded a portion of the recovery from the misfeasors.  Where the essential features of an individual's purported chicanery already have been illuminated, by contrast, affording a private party an incentive to bring suit is unwarranted, as it would add nothing to the Commonwealth's knowledge; in such circumstances, the MFCA prohibits such suits unless the Commonwealth intervenes.  Specifically, the MFCA contains a public disclosure bar that generally requires

dismissal of an action "if substantially the same allegations or transactions as alleged in the action . . . [previously have been] publicly disclosed" through certain enumerated sources. G. L. c. 12, § 5G (c).  Applying this public disclosure bar to the complaint at issue here, a Superior Court judge dismissed the complaint.  Because the complaint rested on information that already had been exposed to the light of day, we affirm.[3]

1.  Background.  We recite the facts as set forth in the complaint, viewing all of the allegations as true and drawing all reasonable inferences in the plaintiff relator's favor.  See Magliacane v. Gardner, 483 Mass. 842, 844 (2020), citing Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 595 (2017).

a.  Relator's claims.  The relator, Johan Rosenberg, commenced this action on behalf of the Commonwealth against the defendants -- certain financial institutions and their subsidiaries, see note 2, supra -- alleging that the defendants collectively engaged in and conspired to engage in fraud in connection with resetting interest rates for certain municipal bonds, referred to as variable rate demand obligations (VRDOs). VRDOs are long-term, tax-exempt, variable rate bonds.  The

---

[3] We recognize the amicus briefs submitted by CFA Institute and Taxpayers Against Fraud Education Fund in support of the plaintiff, and the amicus briefs submitted by the Greater Boston Chamber of Commerce and the New England Legal Foundation in support of the defendants.

Commonwealth and its subdivisions[4] issue VRDOs to finance long-term public projects or infrastructure, such as airports, ports, roads and bridges, and affordable housing.  Because interest rates on the bonds are reset on a periodic basis, often weekly, by the remarketing agent, the bonds allow issuers, like the Commonwealth, to borrow money for long periods of time while paying short-term interest rates.  The Commonwealth retained the defendants as remarketing agents to perform the requisite periodic resetting of the VRDO interest rates.  According to the complaint, the contracts between the Commonwealth and the defendants required that the defendants "actively and individually market and price these bonds at the lowest possible interest rates" that would permit the sale of the VRDOs on a given rate determination date.[5]

---

[4] For simplicity, in our discussion of the MFCA, our references to the Commonwealth also will include its subdivisions.

[5] The relator frequently summarizes the defendants' obligation as to obtain "the lowest possible interest rate"; the obligation, as set forth in the official statements for the VRDOs, however, is that defendants were "required to determine the applicable rate of interest that, in its judgment, is the lowest rate that would permit the sale of the [VRDO] bearing interest at the Weekly Rate at par plus accrued interest, if any, on and as of the Rate Determination Date.  The interest rate will reflect, among other factors, the level of market demand for the [VRDO] (including whether the Remarketing Agent is willing to purchase [the VRDO] for its own account)." Likewise, the model disclosure obligations, for which the relator argues the defendants were responsible, were "to set the interest rate at the rate necessary, in its judgment, as the

The relator maintains that the defendants did not perform these services as promised; instead, the defendants engaged in a rate setting scheme, which he refers to as "robo-resetting," whereby the defendants "mechanically set the rates en masse without any consideration of the individual characteristics of the bonds, the associated market conditions[,] or investor demand."  The relator, who states that he has over twenty years of experience in advising municipalities on issuing securities, asserts that he confirmed his suspicions of this "bucket" rate-setting scheme through a forensic analysis of published interest rate data for these types of bonds.  The interest rates for VRDOs are published daily on a publicly available website, Electronic Municipal Market Access (EMMA).[6]  The relator's analysis revealed that, for certain groups of VRDOs,[7] the

---

lowest rate that permits the sale of the VRDOs at [one hundred percent] of their principal amount (par) on the interest reset date."  In our analysis of the claims regarding the "lowest interest rate," we rely upon this contractual explanation of the defendants' responsibilities.

[6] EMMA is the "official repository for information on all municipal bonds."  It is a freely accessible, public website and "serves as the venue for public access to variable rate security information, transaction data, primary market disclosures and continuing disclosures . . . , as well as market statistics and investor education."

[7] For example, the relator explains that, "with respect to the 1,083 VRDOs in [one bank's] largest bucket, 941 of them had the identical interest rate change (at least [eighty percent] of the time) for a full year."  Moreover, he argues, his analysis

interest rates moved in lock step; the relator labels these groups "buckets"[8] of VRDOs.  This collective interest rate setting, he maintains, had no business justification, and demonstrates a lack of individualized judgment as to the lowest interest rate that would permit the sale of a given VRDO at the time the interest rate was reset.  He argues that this collective rate setting thereby resulted in "artificially high interest rates on Massachusetts VRDOs," and violated the defendants' obligations to the Commonwealth to market the VRDOs at the lowest interest rate that would permit sale on a given rate determination date.  Thus, the relator contends, the defendants fraudulently collected fees for services as remarketing agents that they did not perform.

The relator argues that the defendants also benefited in another manner from their approach to resetting interest rates.  Specifically, the artificially high interest rates resulting from the defendants' scheme caused VRDO investors to hold the bonds rather than to exercise their "put" options.  A put option allows an investor in a VRDO to redeem the VRDO at face value

---

showed that the VRDO rates moved together across institutions, suggesting collusion among the defendants.

[8] The relator identified a particular VRDO as falling into a bucket if, for eighty percent of the time over a period of twenty-six weeks, the change in its interest rate was identical to that of other interest rate changes of VRDOs in the bucket.

plus interest earned. When a put option is exercised, a remarketing agent becomes responsible for reselling the redeemed securities to new investors. If a remarketing agent is unable to find another investor, a liquidity provider must step in and purchase the VRDO from the redeeming investor. For this reason, VRDOs are backed by liquidity agreements, often letters of credit, to finance redemptions where no new investor is found. The same financial institution (here, the defendants) may serve as both the remarketing agent and the issuer of the letter of credit for a particular VRDO. According to the complaint, the defendants were paid fees by the Commonwealth to provide letter of credit services. By setting the interest rates for VRDOs artificially high, the defendants assured that the holders of the bonds would not exercise their put options and the defendants would not have to find other investors to purchase the bonds or to buy the bonds themselves.

As a result of these actions, the relator contends, the defendants collected millions of dollars in fees from the Commonwealth for remarketing services that they did not provide. He maintains that the defendants also extracted millions of dollars in fees as liquidity providers even though the chance of needing to draw on the letters of credit services was very low ("rarely, if ever, called upon") because bond holders were unlikely to exercise their put options in view of the

artificially high interest rates.  Because the interest rates were artificially high, the relator asserts, the Commonwealth paid extra interest on its VRDOs (some of which were owned by the defendants).[9]

b.  Procedural history.  The relator filed his initial complaint in 2014; the Commonwealth declined to intervene.[10]  In 2017, the relator filed an amended complaint, and, in 2019, he filed a second amended complaint, now at issue before us.

---

[9] The complaint asserts that VRDO investors "typically" are tax-exempt money market funds, which the defendants "in many instances own or manage."

[10] The relator also has commenced similar suits in other jurisdictions, including Illinois, California, and New York. While in Massachusetts the relator is proceeding as an individual, in other jurisdictions he has brought suit through Edelweiss Fund, LLC.  See State ex rel. Edelweiss Fund, LLC vs. JP Morgan Chase & Co., Cal. Super. Ct., No. CGC-14-540777, slip op. at 1, 11-12 (San Francisco County Aug. 7, 2019) (Edelweiss Fund) (denying defendants demurrer on ground that under California precedent no public disclosure occurred); State ex rel. Edelweiss Fund LLC vs. JPMorgan Chase & Co., Ill. Cir. Ct., No. 2017-L-000289, slip op. at 1, 12 (Cook County Feb. 1, 2019) (denying defendants' motion to dismiss on ground that relator was original source); State ex rel. Edelweiss Fund, LLC vs. JPMorgan Chase & Co., Supreme Ct. of N.Y., No. 100559/2014 (N.Y. County Mar. 27, 2020), aff'd, 189 A.D.3d 723 (N.Y. 2020) (denying defendants' motions to dismiss for failure to state claim with requisite particularity, and not reaching whether case should be dismissed pursuant to public disclosure bar, noting that State Attorney General asserted it would exercise State's right to object to dismissal under public disclosure bar).  See notes 23 & 31, infra.

The defendants filed a joint motion to dismiss, which the Commonwealth did not oppose. The judge allowed the motion,[11] and the relator appealed. We then transferred the appeal to this court on our own motion.

2. Discussion. a. Standard of review. We review the allowance of a motion to dismiss de novo. Goodwin v. Lee Pub. Sch., 475 Mass. 280, 284 (2016), citing Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011). We "accept as true the factual allegations in the complaint and the attached exhibits, draw all reasonable inferences in the [relator's] favor, and determine whether the allegations 'plausibly suggest' that the [relator] is entitled to relief on that legal claim." Buffalo-Water 1, LLC v. Fidelity Real Estate Co., 481 Mass. 13, 17 (2018). See Revere, 476 Mass. at 595. "[M]atters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account" (quotation and citation omitted). Iannacchino v. Ford Motor Co., 451 Mass. 623, 631 n.14 (2008). See Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 224 (2011), S.C., 466 Mass. 156 (2013), quoting Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004) ("Where . . . the [relator] had

---

[11] As did the motion judge, because of the result we reach, we do not address the other arguments raised by the defendants in support of their motion to dismiss.

notice of [the extrinsic] documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment . . .").

In their motion to dismiss, the defendants argued that dismissal was required pursuant to the public disclosure bar of the MFCA because the transactions at issue previously had been disclosed to the public through news media and the relator was not an original source of the information concerning the fraud. This motion requires construction of the public disclosure bar, a matter of statutory interpretation that we review de novo. See Ortiz v. Examworks, Inc., 470 Mass. 784, 788 (2015), citing Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006).

b.  Statutory background.  The MFCA prohibits making fraudulent claims against the Commonwealth and its municipalities.  See G. L. c. 12, §§ 5A-5O.  The statute also permits enforcement of that prohibition by means of qui tam actions, in which "[a]n individual, hereafter referred to as a relator, may bring a civil action . . . on behalf of the relator and the [C]ommonwealth or any political subdivision thereof." G. L. c. 12, §§ 5A, 5C (2).  The Commonwealth may intervene and take over the case.  G. L. c. 12, §§ 5C (3), 5D.  Successful

relators are awarded a percentage of the funds recovered by the Commonwealth.  G. L. c. 12, § 5F.

Qui tam actions have the "salutary purpose of encouraging the disclosure of fraudulent schemes."  See United States ex. rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 206 (1st Cir. 2016) (Winkelman).  At the same time, "this statutory paradigm . . . creates perverse incentives for opportunists to seek compensation based on fraud already apparent from information in the public domain."  Id.  As does its counterpart, the Federal False Claims Act, 31 U.S.C. § 3730(e)(4)(A) (FFCA), the MFCA therefore includes a "public disclosure bar," G. L. c. 12, § 5G (c), which provides:[12]

> "The court shall dismiss an action or claim pursuant to [G. L. c. 12, §§ 5A-5O], inclusive, unless opposed by the [C]ommonwealth or any political subdivision thereof, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed: (1) in a Massachusetts criminal, civil or administrative hearing in which the [C]ommonwealth is a party; (2) in a Massachusetts legislative, administrative, auditor's or inspector general's report, hearing, audit or investigation; or (3) from the news media, unless the action is brought by the attorney general, or the relator is an original source of the information."

---

[12] Because the MFCA mirrors the FFCA, we look to Federal decisions for guidance in analyzing the MFCA.  See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 611 (1980) ("Where the Legislature in enacting a statute follows a Federal statute, we follow the adjudged construction of the Federal statute by the Federal courts").

The bar seeks to prevent "parasitic" suits, United States ex rel. Ondis v. Woonsocket, 587 F.3d 49, 53 (1st Cir. 2009) (Ondis), where a relator, "instead of plowing new ground, attempts to free-ride by merely repastinating previously disclosed badges of fraud," id., citing United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 26-27 (1st Cir. 2009), cert. denied, 561 U.S. 1005 (2010).

Where, as here, the Commonwealth chooses not to intervene, a multipart inquiry governs whether the public disclosure bar applies.[13]  "The first three parts of this inquiry ask: (1) whether there has been a prior, public disclosure of fraud; (2) whether that prior disclosure of fraud emanated from a source specified in the statute's public disclosure provision; and (3) whether the relator's qui tam action is [substantially the same as] that prior disclosure of fraud." United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 109 (1st Cir. 2010) (Poteet).  See United States ex rel. Reed v. KeyPoint Gov't Solutions, 923 F.3d 729, 741 (10th Cir. 2019) (Reed); Ondis, 587 F.3d at 53.  Where "all three questions are answered in the affirmative, the public disclosure bar applies unless the

---

[13] The Attorney General's decision not to intervene in this case distinguishes it from the parallel litigation in New York. See Edelweiss Fund, LLC, Supreme Ct. of N.Y., No. 100559/2014, supra; note 10, supra.

relator qualifies under the 'original source' exception."[14] Poteet, supra at 109-110, quoting Ondis, supra at 53-54.

c. Application of the public disclosure bar. i. Prior public disclosure. We first consider whether the allegations or transactions identified in the complaint previously had been publicly disclosed at the time the complaint was filed. See Winkelman, 827 F.3d at 208. As discussed, a prior public disclosure occurs when the essential elements exposing the fraud are in the public domain. Poteet, 619 F.3d at 110. The disclosure must constitute either (a) a direct allegation of fraud or (b) a transaction from which readers or listeners may infer fraud. Id. See United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994) (Springfield). Here, the defendants argued only that the latter theory was applicable, contending that the critical elements of the purported fraudulent transactions were in the public domain. Thus, to prevail on their motion to dismiss, the defendants must

---

[14] Pursuant to G. L. c. 12, § 5A, an "original source" is

"an individual who: (1) prior to a public disclosure under paragraph (3) of [§] 5G, has voluntarily disclosed to the [C]ommonwealth or any political subdivision thereof the information on which allegations or transactions in a claim are based; or (2) has knowledge that is independent of and materially adds to the publicly-disclosed allegations or transactions, and who has voluntarily provided the information to the [C]ommonwealth or any political subdivision thereof before filing a false claims actions."

show a disclosure of the two critical elements of the transactions; specifically, the defendants must establish that "both [the] misrepresented state of facts and [the] true state of facts so that the listener or reader may infer fraud" were in the public domain when the intervener filed his claims. Poteet, supra. See Winkelman, supra; Springfield, supra ("[I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed").

A. Misrepresented state of facts. According to the complaint, the asserted misrepresented state of facts comprised the defendants' representations that they would comply with their obligations as remarketing agents, as set forth in their agreements with the Commonwealth. Specifically, the relator alleges that the defendants misrepresented that they would "determine the applicable rate of interest that, in [their] judgment, is the lowest rate that would permit the sale of the [VRDOs] bearing interest at the applicable interest rate at par plus accrued interest, if any, on and as of the applicable Rate Determination Date."[15] See, e.g., Winkelman, 827 F.3d at 209

---

[15] The "Rate Determination Date" is the date that the interest rate is reset.

(purported misrepresented state of facts comprised defendants'
asserted compliance with requirement in Federal regulation that
pharmacies charge generic drug prices equal to lowest prices
charged to customers when in fact charged price was higher);
Ondis, 587 F.3d at 52, 54 (asserted misrepresentation was
statements in city's Federal grant applications that it would
promote development of public housing when it planned to
discourage such development).

The defendants' representations that they would comply with
the obligations in their agreements with the VRDO issuers are
set forth in several publicly available sources, including
Municipal Securities Rulemaking Board (MSRB)[16] rules that address
remarketing agents' duties to VRDO issuers; Securities Industry
Financial Markets Association (SIFMA)[17] model disclosures; and
the remarketing agreements, including remarketing circulars and

---

[16] The MSRB is "a Congressionally-chartered, self-regulatory
organization governed by a [twenty-one]-member board of
directors that has a majority of public members, in addition to
representatives of regulated entities.  The MSRB is subject to
oversight by the Securities and Exchange Commission (SEC)."

[17] The SIFMA model disclosures set forth the disclosures
that SIFMA advises remarketing agents to make to VRDO issuers in
order to comply with the obligation to deal fairly and honestly
with issuers under MSRB Rule G-17.  In relevant part, the model
disclosures provide that a remarketing agent is "required to set
the interest rate at the rate necessary, in its judgment, as the
lowest rate that permits the sale of the VRDOs at [one hundred
percent] of their principal amount (par) on the interest reset
date."

official statements, reached between the defendants and the Commonwealth. See Poteet, 619 F.3d at 110, citing United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp., 540 F.3d 1180, 1185 (10th Cir. 2008) (disclosure "is 'public' if it is generally available to the public"). These sources disclose that the defendants undertook (purportedly falsely) to comply with their obligations to obtain the lowest possible interest rates that would have permitted a sale on the market on a given rate determination date. Thus, the defendants have shown a prior public disclosure of the misrepresented state of facts alleged in the complaint.

B. True state of facts. Accordingly, we turn to whether the second element of fraud was disclosed, namely, whether there was a public disclosure of the "true state of facts so that the listener or reader may infer fraud." See Poteet, 619 F.3d at 110. The truth, according to the complaint, was that the defendants did not obtain the lowest interest rates that would have permitted the sale of the VRDOs, and instead "engaged in a practice of setting their VRDO rates mechanically and collectively, without any consideration of the unique attributes of each particular bond." See, e.g., Winkelman, 827 F.3d at 209 (true state of affairs was that defendant was not in fact billing correctly); Ondis, 587 F.3d at 52, 54 (true state of affairs was city's plan to oppose public housing while obtaining

grants for its purported public housing projects on representation that it would promote public housing).

The information reflecting this asserted truth was discernable through the published EMMA data[18] available to the public via the Internet.  Indeed, the relator used the same data as that disclosed on the EMMA website to conclude that the defendants were not setting the lowest interest rates on the VRDOs because, his analysis showed, they were grouping unrelated bonds rather than setting the rate for each bond individually. See Winkleman, 827 F.3d at 209 ("Enough was revealed in the . . . disclosures to put the government on notice of the potential fraud without the aid of these relators").  Contrary to the relator's contention, neither the need to perform analysis on the publicly available information nor the benefit of his expertise renders the true state of affairs hidden.  See Poteet, 619 F.3d at 111 ("If the materials necessary to ground an inference of fraud are generally available to the public, . . . there is nothing to prevent the government from detecting it.  Concomitantly, the likelihood of parasitic qui tam actions in such circumstances is high, providing a reason for the public disclosure bar"); United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 688 (D.C. Cir.),

---

[18] EMMA is a free, open-access website that publishes information on all municipal bonds.  See note 6, supra.

cert. denied, 522 U.S. 865 (1997) (Findley), citing Springfield, 14 F.3d at 655 ("[I]f a relator merely uses his or her unique expertise or training to conclude that the material elements already in the public domain constitute a false claim, then a qui tam action cannot proceed").  "[T]he only question is whether the material facts exposing the alleged fraud are already in the public domain, not whether they are difficult to recognize."  United States ex rel. Conrad vs. Abbott Lab., Inc., U.S. Dist. Ct., No. 02-11738-RWZ (D. Mass. Feb. 25, 2013), citing Ondis, 587 F.3d at 59-60.  Thus, it suffices that other members of the public, albeit with sufficient expertise and after having conducted some analysis, could have identified the true state of affairs by conducting the same data-crunching exercise as did the relator, using the data publicly available on the EMMA website.  See Findley, supra, citing Springfield, supra.

ii.  Statutorily enumerated sources.  Having determined that there was a public disclosure of the essential elements of the fraud, we turn to consider the second prong of the public disclosure bar:  whether the prior disclosure "emanated from a source specified in the statute's public disclosure provision." Poteet, 619 F.3d at 109.  "By its plain terms, the public disclosure bar applies to some methods of public disclosure and not to others."  Schindler Elevator Corp. v. United States ex

rel. Kirk, 563 U.S. 401, 414 (2011) (Schindler). Specifically, we must decide whether the forum in which the public disclosure was made falls within any of three sources enumerated in the statute -- (1) "a Massachusetts criminal, civil or administrative hearing in which the [C]ommonwealth is a party"; (2) "a Massachusetts legislative, administrative, auditor's or inspector general's report, hearing, audit or investigation"; or (3) "the news media." See G. L. c. 12, § 5G (c). We turn to consider each of the critical elements of the public disclosure set forth under the first prong of the public disclosure bar test -- first, the misrepresented state of affairs and, second, the true state of the facts.

A.  Source of public disclosure of misrepresented state of affairs.  According to the complaint, the first publicly disclosed element of the asserted fraud -- namely, the misrepresentation that the defendants would undertake to obtain the lowest interest rates that, in their judgment, would permit the sale of the VRDOs -- was disclosed in the governing remarketing agreements, including in the official statements.[19]

---

[19] As defined by the MSRB, an official statement is

"[a] document prepared by or on behalf of the issuer of municipal securities in connection with a primary offering that discloses material information on the offering of such securities.  Official statements typically include information regarding the purposes of the issue, how the securities will be repaid, and the financial and economic

These official statements comprise Massachusetts "reports,"[20] one of the statutorily enumerated sources.

B.  Source of public disclosure of the true state of affairs.  The second publicly disclosed element of the fraud -- namely, the assertion that the defendants were not obtaining the lowest interest rate that would permit the sale of the VRDOs, and instead were remarketing the bonds en masse in a way that did not obtain the lowest rates -- was disclosed on the EMMA website.  The defendants argue that EMMA constitutes "news media," the third enumerated source in the MFCA.  The relator contends that because EMMA does not have editorial content, narrative, exposition, or analysis of the financial data it reports, it cannot constitute news media.

_____

> characteristics of the issuer, conduit borrower or other obligated person with respect to the offered securities. Investors and market intermediaries may use this information to evaluate the credit quality of the securities and potential risks of the primary offering."

See MSRB, Glossary of Municipal Securities Terms, http://msrb .org/Glossary/Definition/OFFICIAL-STATEMENT-_OS_.aspx.

[20] A report is "something that gives information." Schindler, 563 U.S. at 407 (responses to Freedom of Information Act requests are reports).  See Ondis, 587 F.3d at 56.  Each VRDO's official statement details the terms of the VRDO and enumerates the remarketing agents' obligations; thus, the official statements constitute something that gives information. Further, official statements are prepared on behalf of the issuer.

"A fundamental principle of statutory interpretation 'is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006), quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934). See Sullivan v. Brookline, 435 Mass. 353, 360 (2001). If the meaning of the "statutory language is clear and unambiguous, our inquiry ends." Commonwealth v. Garvey, 477 Mass. 59, 62 (2017).

Where, as here, a statutory term is undefined, we look to its ordinary meaning. See Ten Local Citizens Group v. New England Wind, LLC, 457 Mass. 222, 229 (2010). See Schindler, 563 U.S. at 407 (enumerated sources in FFCA take "ordinary meaning" of words). In ordinary usage, "news" is defined as (1) "a report of a recent event; intelligence; information"; (2) "the presentation of a report on recent or new events in a newspaper or other periodical or on radio or television"; and (3) "such reports taken collectively; information reported." Webster's New Universal Unabridged Dictionary 1295 (2003). "Media" is defined as "[t]he means of communication, as radio

and television, newspapers, and magazines, that reach or influence people widely." Id. at 1193. Thus, the ordinary meaning of the words "news media" is quite broad and includes information shared through means of communication that reach or influence people widely. See United States ex rel. Osheroff v. Humana, Inc., 776 F.3d 805, 813 (11th Cir. 2015) (Osheroff) (court determined that "news media" includes newspaper articles and advertisements of clinical services).

Considering the public disclosure bar in the context of the statute as a whole confirms that "news media" is a broad category, albeit not unlimited. See Schindler, 563 U.S. at 408 ("to determine the meaning of one word in the public disclosure bar, we [also] must consider the provision's 'entire text,' read as an 'integrated whole'" [citation omitted]). On the one hand, unlike the other two sources of public disclosures in the MFCA, Massachusetts government reports and hearings, the term "news media" is not limited to Massachusetts-based knowledge. On the other hand, construing "news media" as a broad catch-all would eviscerate the plain language of the public disclosure bar, which applies only to disclosures from three enumerated sources. See id. at 414.

Because the breadth of the term "news media" -- in particular, whether it covers a publicly available website like EMMA -- is ambiguous based on the statutory language and the

statutory scheme as a whole, "we turn to the history of the statute" to assist us in discerning the Legislature's intent in using these words. See Commonwealth v. Hamilton, 459 Mass. 422, 433 (2011). The history of the FFCA[21] reflects decades of adjustments to the limitations on qui tam suits in "an effort to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." Schindler, 563 U.S. at 413, quoting Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 295 (2010). The MFCA, originally enacted in 2000, largely has tracked the developments of the FFCA, including amendments in 2012 to follow the Federal amendments of 2010. See St. 2000, c. 159, § 18, inserting G. L. c. 12, §§ 5A-5O (originating as 2000 House Doc.

---

[21] "As originally enacted in 1863, the [FFCA] placed no restriction on the sources from which a qui tam relator could acquire information on which to base a lawsuit." Schindler, 563 U.S. at 412. See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 294-295 (2010); id. at 294, citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 545-548 (1943) (upholding "relator's recovery even though he had discovered the fraud by reading a [F]ederal criminal indictment -- a quintessential 'parasitic' suit"). Since then, Congress has revised the FFCA and the public disclosure ban several times, including most recently in 2009 and 2010, to balance the two statutory purposes of encouraging the disclosure of fraud while at the same time discouraging parasitic suits. See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313, 124 Stat. 184 (2010); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 3301, 124 Stat. 2079 (2010).

No. 5100); St. 2012, c. 139, § 22-34, amending G. L. c. 12, §§ 5A-5C, 5F, 5G, 5I-5K, 5N.  See also Makalusky, Blowing the Whistle on the Need to Clarify and Correct the Massachusetts False Claims Act, 94 Mass. L. Rev. 41, 41 (2012).  These changes made the public disclosure bar at the same time both more and less exacting.  Thus, the MFCA, as with the FFCA, reflects the Legislature's efforts to balance the promotion of qui tam actions while also discouraging parasitic suits.  This legislative history further demonstrates the Legislature's intent that "news media" be given a broad but balanced construction.  See Hamilton, 459 Mass. at 433.

Thus, "news media" is broad enough to encompass the many ways in which people in the modern world obtain financial news, including from publicly available websites on the Internet. See, e.g., United States ex rel. Repko vs. Guthrie Clinic, P.C., U.S. Dist. Ct., No. 3:04CV1556 (M.D. Pa. Sept. 1, 2011), aff'd, 490 Fed. Appx. 502 (3d Cir. Aug. 1, 2012) (online commercial financial software and Internet programs providing summaries or analysis of trends in market transactions were news media because "[t]hough they are not traditional news sources, they serve the same purpose as newspapers or radio broadcasts, to provide the general public with access to information").[22]

---

[22] Neither the plain meaning of "news media" nor the legislative history of the MFCA supports the relator's

As discussed, see note 6, <u>supra</u>, EMMA is the "official repository for information on all municipal bonds." It provides updates to bond market information by means of the Internet. It is publicly available and widely disseminated. "The EMMA website was established to increase the transparency of the municipal securities market by providing free public access to municipal securities disclosures and data. EMMA provides investors, [S]tate and local governments and other market participants with key information and tools to put that information into context." EMMA, Overview, https://emma.msrb .org/AboutEmma/Overview [https://perma.cc/F78C-KQ8X]. In this respect, EMMA is much like traditional news sources that report market data and fall within the scope of the term. See <u>Poteet</u>, 619 F.3d at 110 (national newspaper falls within definition of

---

contention that "news media" is limited to sources with editorial analysis. Compare <u>United States ex rel. Kraxberger</u> v. <u>Kansas City Power & Light Co.</u>, 756 F.3d, 1075, 1079-1080 (8th Cir. 2014) (<u>Kraxberger</u>) (publicly available website that disseminates information, even simply by reproducing it verbatim in transcript without commentary, was news media). Moreover, contrary to the relator's argument, the niche nature of the municipal bond rates published on the EMMA website does not exclude it from the broad scope of the meaning of news media. See <u>United States ex rel. Alcohol Found., Inc</u>. v. <u>Kalmanovitz Charitable Found., Inc.</u>, 186 F. Supp. 2d 458, 463 (S.D.N.Y.), aff'd, 53 Fed. Appx. 153 (2d Cir. 2002), cert. denied, 540 U.S. 949 (2003) (that "the ordinary meaning of the statutory term 'news media,' would encompass the publication of information in scholarly or scientific periodicals" is "[n]o different from newspaper reporters, [whose] scholarly and scientific authors also disseminate information to the public in a periodic manner").

news media). Accordingly, we conclude that the term "news media" in the public disclosure bar includes within its scope the EMMA website, which consists of publicly accessible financial data.[23] See Osheroff, 776 F.3d at 813 ("Because the term 'news media' has a broad sweep, we conclude that the newspaper advertisements and the clinics' publicly available websites, which are intended to disseminate information about the clinics' programs, qualify as news media for purposes of the public disclosure provision").[24]

_____

[23] We note that, in parallel litigation, the Superior Court of California determined that EMMA was not news media for purposes of the public disclosure bar under the California false claims act. See Edelweiss Fund, Cal. Super. Ct., No. CGC-14-540777, supra at 8-9, citing State ex rel. Bartlett v. Miller, 243 Cal. App. 4th 1398, 1414 (2016); note 10, supra. There, unlike here, the court was bound by State appellate precedent that summarily held, without reference to the plain meaning of the words "news media," the statutory scheme as a whole, or the legislative history, that the Securities and Exchange Commission online database Electronic Data Gathering, Analysis, and Retrieval (EDGAR) was not news media; the Superior Court then analogized EMMA to the EDGAR database. See Edelweiss Fund, Cal. Super. Ct., No. CGC-14-540777, supra at 7-9.

[24] We need not address the question whether all public websites are encompassed within the meaning of "news media." See Osheroff, 776 F.3d at 813 (publicly available websites intended to disseminate information qualify as "news media" for purposes of public disclosure); Kraxberger, 756 F.3d at 1078-1079 (transcript that was publicly available on website was considered disclosed through news media); United States ex rel. Green v. Service Contract Educ. & Training Trust Fund, 843 F. Supp. 2d 20, 32 (D.D.C. 2012) (collecting cases; "courts that have considered the issue have construed the term to include readily accessible websites"). Compare United States ex rel. Hong v. Newport Sensors, Inc., 728 Fed. Appx. 660, 662-663 (9th Cir. 2018) (declining to hold that most public websites

iii. <u>Disclosure of substantially the same allegations or transactions</u>. The third prong of the public disclosure inquiry is whether the public disclosure includes "substantially the same allegations or transactions as alleged in the action or claim." See G. L. c. 12, § 5G (c).[25] "[W]e must compare the substance of the prior disclosures with the substance of the relator's complaint." <u>Poteet</u>, 619 F.3d at 114. "The operative question is whether the public disclosures were sufficient to set the government 'on the trail of the alleged fraud without

_____

generally fall within category of news media); United States ex rel. Integra Med Analytics LLC <u>vs</u>. Providence Health & Servs., U.S. Dist. Ct., CV 17-1694 PSG (SSx) (C.D. Cal. July 16, 2019) ("applying the news media provision to anything ever published publicly on the [I]nternet is contrary to the ordinary meaning of the term 'news media' and has the potential to eviscerate the balance Congress struck between encouraging private parties to bring forth evidence of fraud and preventing parasitic suits").

[25] The 2010 and 2012 amendments to the FFCA and the MFCA, respectively, amended the public disclosure bar from precluding claims "based upon" public disclosure to banning those "substantially the same" as the assertions already publicly disclosed. This change codified then-existing Federal jurisprudence that interpreted "based upon" to mean "substantially the same." See <u>Bellevue</u> v. <u>Universal Health Servs. of Hartgrove, Inc.</u>, 867 F.3d 712, 718 (7th Cir. 2017), cert. denied, 138 S. Ct. 1284 (2018) (amendment "expressly incorporates the 'substantially similar' standard in accordance with the interpretation of this circuit and most other circuits"). Therefore, in considering whether the claims at issue are substantially the same, we rely on cases both before and after these amendments. See <u>Reed</u>, 923 F.3d at 743-744 ("the 2010 amendment confirms the vitality of our pre-2010 standard"); <u>United States ex rel. Mateski</u> v. <u>Raytheon Co.</u>, 816 F.3d 565, 569 n.7 (9th Cir. 2016) ("our analysis of the issue of substantial similarity would be the same under either version [of the provision establishing the public disclosure bar]").

[the relator's] assistance.'" <u>Reed</u>, 923 F.3d at 744, quoting <u>United States ex rel. Fine</u> v. <u>Sandia Corp</u>., 70 F.3d 568, 571 (10th Cir. 1995). "'Substantially the same' . . . connotes a standard that requires only the essentials of the relator's allegations to be identical to or of an identical type as those disclosed publicly." <u>Reed</u>, <u>supra</u> at 748 n.12. See <u>United States ex rel. Boothe</u> v. <u>Sun Healthcare Group, Inc</u>., 496 F.3d 1169, 1174 (10th Cir. 2007) ("complete identity of allegations" is unnecessary; it is enough for "essence" of relator's allegations to be "'derived from' a prior public disclosure"). A "complaint that targets a scheme previously revealed through public disclosures is barred even if it offers greater detail about the underlying conduct." <u>Winkelman</u>, 827 F.3d at 210, citing <u>Poteet</u>, 619 F.3d at 115.

As discussed, the complaint at issue here relies upon the defendants' obligations, disclosed in the official statements, and the interest rates, which are disclosed on EMMA, and which the relator analyzed to reveal the asserted failure of the defendants to meet their obligation individually to set interest rates for each VRDO. The relator contends that these are not substantially the same as his allegations because, he asserts, the rates were set through a mechanical, algorithmic approach that the relator has coined "robo-resetting." Yet defining "how" the rates were set does not change the essential shared

substance between the public disclosures and the complaint.  The crux of the alleged fraud is the failure individually to set rates and instead setting rates by grouping disparate VRDOs, a conclusion deciphered and decipherable from the public disclosures of the rates themselves.  See Repko, U.S. Dist. Ct., No. 3:04CV1556 (M.D. Pa.), supra ("though not identical to [the] relator's complaint, the information publicly disclosed is substantially similar to the complaint").  In sum, the publicly disclosed information was sufficient to put the Commonwealth "on the trail of the alleged fraud" without the relator's assistance.  See Reed, 923 F.3d at 744, citing Fine, 70 F.3d at 571.

d.  Original source exception.  Because the public disclosure bar is applicable in this case, the complaint must be dismissed unless the relator was an "original source."  See Poteet, 619 F.3d at 109-110; Springfield, 14 F.3d at 656.  General Laws c. 12, § 5A, defines two types of relators who may qualify as original sources:

> "an individual who:  (1) prior to a public disclosure under paragraph (3) of [§] 5G, has voluntarily disclosed to the [C]ommonwealth or any political subdivision thereof the information on which allegations or transactions in a claim are based; or (2) has knowledge that is independent of and materially adds to the publicly-disclosed allegations or transactions, and who has voluntarily provided the

information to the [C]ommonwealth or any political subdivision thereof before filing a false claims actions."[26]

The relator argues that he qualifies as the second type of original source because, he contends, he has knowledge that both is "independent of" and "materially adds" to the publicly disclosed allegations or transactions.

The independent source exception is a "narrow category." See Winkelman, 827 F.3d at 211. The relator contends that his knowledge is "independent of" EMMA because the complaint does not allege that he relied on that website to obtain the data underlying his analysis; it suffices to defeat the defendants' motion, he argues, that the complaint alleges that his forensic analysis also used nonpublic, proprietary sources notwithstanding that the same data were available from EMMA.

---

[26] Prior to the 2012 amendments to the MFCA, an original source was required to have direct and independent knowledge. See G. L. c. 12, § 5A, inserted by St. 2000, c. 159, § 18 (original source was defined "as individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the attorney general, without public disclosure, before filing an action"). Thereafter, original sources need not have direct knowledge, but, rather, must have knowledge that "is independent of and materially adds to the publicly-disclosed allegations or transactions." See G. L. c. 12, § 5A. The change makes it more feasible for relators who are not insiders to bring suit. See United States ex rel. Hagerty v. Cyberonics Inc., 95 F. Supp. 3d 240, 261-262 (D. Mass. 2015), aff'd, 844 F.3d 26 (1st Cir. 2016); Makalusky, Blowing the Whistle on the Need to Clarify and Correct the Massachusetts False Claims Act, 94 Mass. L. Rev. 41, 59 (2012).

The relator cites no authority for the proposition that a relator may take advantage of the original source exception by using a nonpublic source to access the exact same data readily available from public sources.  To the contrary, "when a relator's qui tam action is based solely on material elements already in the public domain, that relator is not an original source."  Kennard v. Comstock Resources, Inc., 363 F.3d 1039, 1045 (10th Cir. 2004), cert. denied, 545 U.S. 1139 (2005).  See United States ex rel. Fried v. West Indep. Sch. Dist., 527 F.3d 439, 443 (5th Cir. 2008) (Fried) (relator did not satisfy independent knowledge requirement despite his independent "sleuthing" that confirmed precise information already publicly disclosed through congressional investigation).  Contrast United States ex rel. Hagerty v. Cyberonics Inc., 95 F. Supp. 3d 240, 260 (D. Mass. 2015), aff'd, 844 F.3d 26 (1st Cir. 2016) (relator satisfied independent knowledge requirement where he was source of information, later publicized in government report, regarding defendants' fraudulent sales practices).  Nothing in the legislative history suggests a legislative intent to expand the scope of the original source exception as the relator suggests.  Indeed, the history of the public disclosure bar, which exhibits a careful balance between encouraging individuals with previously unknown information to come forward and discouraging parasitic suits that add little to the information already in

the public domain, see note 21, <u>supra</u>, supports the opposite
conclusion.

The EMMA website publicly reported the same data upon which
the relator relied, and the relator's analysis depended entirely
on the interest rate data, which were available on EMMA.  Thus,
the relator's analysis cannot be said to be "independent of" the
publicly disclosed transaction discussed <u>supra</u>.[27]  See <u>Ondis</u>, 587
F.3d at 59 ("Virtually by definition, a relator whose knowledge
is dependent upon the public disclosure of allegedly fraudulent
transactions cannot be said to have independent knowledge of the
fraud").  Although the relator asserts that he spent
considerable time analyzing the publicly available data to
confirm his suspicions that the defendants were committing
fraud, and that his endeavor was aided by his expertise in the
field, this does not suffice to render his knowledge independent

---

[27] The relator also argues that his knowledge was
independent because it was based on "interviews with witnesses
and industry participants."  In his complaint, however, the
relator alleges that he conducted one interview with a single
employee of one of the defendants; the motion judge correctly
concluded that this interview was irrelevant to the relator's
theory of fraud, as it did not concern the defendants' conduct
as remarketing agents.  On appeal, the relator asserts that he
conducted "additional private interviews," but as these
interviews are not mentioned in the complaint (and also are not
in the record before us), they do not constitute independent
knowledge.

of the publicly disclosed transactions.[28]  See id. at 59-60,

citing Fried, 527 F.3d at 443 ("Expertise that enables a relator

to understand the significance of publicly disclosed

information, without more, is insufficient to qualify him [or

her] as an original source"); United States ex rel. Doghramji

vs. Community Health Sys., Inc., U.S. Dist. Ct., Nos. 3:11 C

442, 3:14 C 2160, 3:15 C 110, 3:14 C 2195 (M.D. Tenn. Apr. 1,

2020) (performing "unique statistical analysis," even if "proven

helpful," cannot survive public disclosure bar).[29]

The relator also argues that he materially added to the

public disclosures because his investigation revealed the robo-

resetting scheme -- that is, a mechanical, algorithmic approach

to resetting rates.  A relator "materially adds" to the public

disclosure when his knowledge "is sufficiently important to

influence the behavior of the recipient."  Winkelman, 827 F.3d

at 211.  See United States ex rel. Advocates for Basic Legal

Equality, Inc. v. U.S. Bank, N.A., 816 F.3d 428, 431 (6th Cir.

2016), cert. denied, 137 S. Ct. 2180 (2017) ("Materiality in

---

[28] The relator argues that the motion judge erred in relying on cases decided before the amendment to the public disclosure bar in 2010, see note 25, supra.  Because the "independent" requirement was retained, however, preamendment cases analyzing this prong remain instructive.

[29] The relator's assertions regarding collusion, which are based on the same analysis, similarly fail to qualify as "independent of" the publicly disclosed transactions.  See Ondis, 587 F.3d at 59.

this setting requires the claimant to show it had information '[o]f such a nature that knowledge of the item would affect a person's decision-making,' is 'significant,' or is 'essential'" [citation omitted]).[30]

_____

[30] The relator points to the arguably broader standard for materiality set forth in United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 307 (3d Cir. 2016) (Moore), where the United States Court of Appeals for the Third Circuit applied the pleading requirement of Fed. R. Civ. P. 9(b) to hold that a relator's information "materially adds" when it "adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue'" (citation omitted). Like the United States Courts of Appeals for the Sixth and Tenth Circuits, we decline to adopt this standard.

Instead, we agree with the United States Court of Appeals for the First Circuit that whether a relator's knowledge "materially adds" to the publicly disclosed information depends on "whether a piece of information is sufficiently important to influence the behavior of the recipient." Winkelman, 827 F.3d at 211, citing Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 2004 (2016). See United States v. Medtronic, Inc., 327 F. Supp. 3d 831, 851 (E.D. Pa. 2018) (contrasting Moore's "relatively broad definition of materiality" with Winkelman's "narrower definition"). See also United States ex rel. Maur v. Hage-Korban, 981 F.3d 516, 528 (6th Cir. 2020) (citing Winkelman standard); Reed, 923 F.3d at 758-759 (expressing concern that Moore's broader standard could "swallow the public disclosure bar" and instead following principles set forth in Winkelman). The Winkelman standard is tied to the plain and ordinary meaning of the term "materially adds." Winkelman, supra. See Ten Local Citizens Group v. New England Wind, LLC, 457 Mass. 222, 229 (2010). We do not determine that details regarding the who, what, when, where, and how of the events at issue required by rule 9(b) would never suffice such that a relator "materially added" to the public disclosure, see Reed, supra at 758 (determination depended on facts and circumstances of particular case), but the fact that a complaint meets the particularized pleading requirements for fraud, alone, is unlikely to do so.

Here, the explanation that the defendants used "robo-resetting" in order to avoid their obligations to set the interest rates for each VRDO individually was not material in the sense required by the MFCA; the salient information was that the defendants promised they would reset rates individually and failed to do so.  How the defendants conducted the fraud -- purportedly in order to discourage holders of VRDOs from selling those bonds -- here through what the relator coins "robo-resetting," is a detail that would not influence the behavior of a recipient who already was armed with the knowledge of the salient elements of the fraud.[31]  See, e.g., Osheroff, 776 F.3d at 815 (addition of details on type of free services clinics were providing, i.e., manner in which fraud was committed, did not materially add to public information).  See also Reed, 923 F.3d at 758 (whether "the . . . [question] how [the fraud was

---

[31] Because we follow the standard set forth in Winkelman, 827 F.3d at 208-209, 211, we depart from the Illinois Circuit Court, which, in parallel litigation involving the same parties as in this case, determined that it could not "conclude that the 'original source' exception does not apply because nothing in the available raw data indicate fraudulent conduct by the defendants as alleged."  See note 10, supra.  The court focused on the relator's allegation concerning the defendants' use of an "algorithmic mechanical system" -- the how -- which it stated was not disclosed by the raw data.  Therefore, the court concluded, the relator had knowledge that was independent of, and materially added to, the publicly disclosed information.  Although the court did not cite Moore, its reasoning is consistent with that standard, by contrast to the narrower Winkelman standard that we adopt here.

perpetrated] actually should be considered sufficiently significant or important to affect the government's actions regarding the fraudulent scheme" depends on facts and circumstances of case).[32]

While the manner in which a defendant accomplished a particular fraud might aid the Commonwealth in its efforts to avert similar fraudulent schemes in the future, or might be material in some other circumstances, the allegation that the defendants used a mechanical, algorithmic mechanism here does nothing to bring to the Commonwealth's attention the existence of the purported fraud, namely, the defendants' asserted failure to set interest rates to the lowest rates the market would bear. Thus, the relator does not qualify as an "original source" for purposes of the MFCA's exception to the public disclosure bar.

Judgment affirmed.

---

[32] The relator's assertion of collusion also did not materially add to the public discourse because it lacked detail beyond his assertion that the defendants must have colluded in order for the interest rates to have changed as they did. The only addition beyond this deduction from the data -- the single interview -- was not relevant to the purported fraud, see note 27, supra, and, in the relator's words, merely "confirmed" the patterns he already had discerned from the data. Compare Reed, 587 F.3d at 761-762 (relator materially added to public disclosure on issue of scienter where her "complaint offer[ed] pages of details describing how [company's] managers knowingly schemed to defraud the government by covering up systemic violations").